PHILLIP A. TALBERT
Acting United States Attorney
CHRISTINA McCALL
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:18-CR-0166-1 TLN |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE:   APRIL 29, 2021<br>TIME:    9:30 A.M.<br>COURT:   Hon. TROY L. NUNLEY |
| ALEXANDER FRANCO GUTIERREZ, | |
| Defendant. | |

## I.   **INTRODUCTION**

### A.    **Scope of Agreement.**

The Indictment in this case charges the defendant with violations of: 18 U.S.C. §§ 1349 and 2326 -- conspiracy to commit mail and wire fraud, enhanced penalties for telemarketing fraud victimizing persons over age 55 (Count One); 18 U.S.C. §§ 1341 and 2326 – mail fraud, enhanced penalties (Counts Two through Eight); 18 U.S.C. §§ 1343 and 2326 – wire fraud, enhanced penalties (Counts Nine through Forty); and 18 U.S.C. § 1956(h) -- conspiracy to commit money laundering (Count Forty-One).  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

PLEA AGREEMENT                                                    1

**B.     Court Not a Party.**

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the Indictment.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.     DEFENDANT'S OBLIGATIONS

**A.     Guilty Plea.**

The defendant will plead guilty to Count 41, Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).  The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1.     Remand.

The defendant agrees that he will remain in custody upon the entry of his plea, while

PLEA AGREEMENT                                    2

awaiting sentencing.

## B.   Restitution.

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses.

Defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the periods of 2012 through 2015.  The amount of restitution will be determined by the Court at the time of the sentencing hearing, or within 90 days of the sentencing hearing.  Restitution payments shall be by cashier's or certified check made payable to the Clerk of the Court.

## C.   Fine.

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed.  The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation.  The government retains the right to oppose the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense.

## D.   Special Assessment.

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to earn the money to pay the assessment, if necessary, by participating in the Inmate Financial Responsibility Program.

## E.   Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw

his plea, this plea agreement is voidable at the option of the government.  If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein.  A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement.  The government also shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge.  The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision.  Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.  The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

PLEA AGREEMENT                                           4

claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

**F.   Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, he will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above, above.

### III.   THE GOVERNMENT'S OBLIGATIONS

**A.   Dismissals/Other Charges.**

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining counts in the pending Indictment. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), VI.B (Stipulations Affecting Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

**B.   Recommendations.**

1.   Acceptance of Responsibility.

The government will recommend a three-level reduction in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**C.**     **Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

**IV.     ELEMENTS OF THE OFFENSE**

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h):

First, beginning no later than June of 2013 and continuing through in or about March of 2014, there was an agreement between two or more persons to commit the offense of money laundering in violation of 18 U.S.C. 1956; and

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

With respect to the object of the conspiracy, the elements for the underlying offense, Money Laundering, are:

(1) that the defendant engaged in a financial transaction that involved proceeds from specified illegal activity; (2) that the defendant knew that the property involved in the financial transaction was from illegal activity; (3) that the financial transaction in fact involved the proceeds of specified unlawful activity; and (4) that the defendant intended the financial transaction . . . . to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

Finally, the specified unlawful activity alleged in the superseding indictment is mail and wire fraud, and conspiracy to commit those offenses, in violation of 18 U.S.C. § 1341, 1343 and 1349.  Mail fraud has the following elements: first, the defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to

PLEA AGREEMENT                                          6

part with money or property; third, the defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and fourth, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme. Wire fraud has the same first three elements as mail fraud, plus: fourth, the defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part of the scheme; and fifth, the wire communication traveled in interstate commerce.

The defendant fully understands the nature and elements of the crimes charged in the Indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.    MAXIMUM SENTENCE

### A.    Maximum Penalty.

The maximum sentence that the Court can impose is 20 years of incarceration, a fine of $500,000 or twice the value of the property involved in the transaction, whichever is greater, a 3-year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.    Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to 2 additional years' imprisonment.

## VI.    SENTENCING DETERMINATION

### A.    Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The

defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.     Stipulations Affecting Guideline Calculation.**

Acknowledging that the Sentencing Guidelines base offense level for money laundering would normally be in U.S.S.G. § 2S1.1, the parties stipulate that U.S.S.G. § 1B1.1 better reflects the defendant's offense conduct.  Therefore, the government and the defendant have stipulated that the following guidelines should apply to this case pursuant to U.S.S.G. § 2B1.2(a).  The stipulations are:

| | | |
|---|---|---|
| 1. | Base Offense Level: | 7 (§ 1B1.1(a)(1)) |
| 2. | Loss Amount: | +18 (§ 2B1.1(b)(1)(J) – over $3.5 mil.) |
| 3. | Over 50 Victims: | +4 (§ 2B1.1(b)(2)(B)) |
| 4. | Committed from Outside U.S.: | +2 (§ 2B1.1(b)(10)(B)) |
| 5. | Adjusted Offense Level: | 31 |
| 6. | Vulnerable Victims: | +4 (§ 3A1.1(b)(1)-(2) – vulnerable due to age) |
| 7. | Acceptance of Responsibility: | -3 (See paragraph III.B.2 above) |
| 8. | Total Offense Level: | 32 |

9.     Criminal History:  The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

10.     Sentencing Range:            121-151 months (The defendant understands that if the criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.)

The parties agree that they will not seek or argue in support of any other specific offense characteristics or Chapter Three adjustments.   Both parties agree not to move for, or argue in support of, any other departure from the Sentencing Guidelines, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1).

The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a).  The government is not obligated to recommend any specific sentence.

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to any further discovery from the government; (f) to subpoena witnesses to testify on his behalf; (g) to confront and cross-examine witnesses against him; and (h) not to be compelled to incriminate himself.

### B.   Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.  The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case.  The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

1  aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

2       Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

3  attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

4  the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

5  herein.

6      **C.**    **Waiver of Attorneys' Fees and Costs.**

7       The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

8  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

9  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

10  (including without limitation any charges to be dismissed pursuant to this plea agreement and any

11  charges previously dismissed).

12      **D.**    **Impact of Plea on Defendant's Immigration Status.**

13       Defendant recognizes that pleading guilty may have consequences with respect to his

14  immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes

15  are removable offenses, including the offense to which the defendant is pleading guilty.  Indeed, because

16  defendant is pleading guilty to Conspiracy to Commit Money Laundering (with a loss over $10,000),

17  removal is presumptively mandatory.  The defendant and his counsel have discussed the fact that the

18  charge to which the defendant is pleading guilty is an aggravated felony, or a crime that is likely to be

19  determined to be an aggravated felony under 8 USC § 1101(a)(43), and that while there may be

20  arguments that defendant can raise in immigration proceedings to avoid or delay removal, it is virtually

21  certain that defendant will be removed.  Removal and other immigration consequences are the subject of

22  a separate proceeding, however, and defendant understands that no one, including his attorney or the

23  district court, can predict to a certainty the effect of his conviction on his immigration status.  Defendant

24  nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his

25  plea may entail, even if the consequence is his automatic removal from the United States.

26      **VIII.**    **ENTIRE PLEA AGREEMENT**

27       Other than this plea agreement, no agreement, understanding, promise, or condition between the

28  government and the defendant exists, nor will such agreement, understanding, promise, or condition

PLEA AGREEMENT        10

1   exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and
2   counsel for the United States.

3   ## IX.   APPROVALS AND SIGNATURES

4   **A.   Defense Counsel.**

5   I have read this plea agreement and have discussed it fully with my client. The plea agreement
6   accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to
7   plead guilty as set forth in this plea agreement.

8   Dated:   4·26·21

9   _____
10   THOMAS A. JOHNSON
    Attorney for Defendant

11

12   **B.   Defendant:**

13   I have read this plea agreement and carefully reviewed every part of it with my attorney. I
    understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully
14   understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my
15   case. No other promises or inducements have been made to me, other than those contained in this plea
16   agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement.
17   Finally, I am satisfied with the representation of my attorney in this case.
18   Dated:   4-26-21

19   _____
20   ALEXANDER FRANCO GUTIERREZ
    Defendant

21

22   **C.   Attorney for United States:**

23   I accept and agree to this plea agreement on behalf of the government.

24   Dated: 4/26/2021
    PHILLIP A. TALBERT
25   Acting United States Attorney
26   _____
27   CHRISTINA McCALL
    Assistant United States Attorney
28

EXHIBIT "A"

Factual Basis for Plea

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

Beginning in approximately August 2012[1] through at least approximately January 2018, defendant ALEXANDER FRANCO GUTIERREZ and his coconspirators were involved in a "lottery" or "sweepstakes" fraud scheme that targeted elderly victims residing in the Eastern District of California and elsewhere. The scheme typically worked as follows: elderly victims were notified by mail or telephone that they had won a sweepstakes or lottery. They were told that they had to pay taxes or insurance fees before they could receive their winnings. The victims were often told not to tell anyone about the prize winnings, and were told to sign non-disclosure agreements that the coconspirators provided. The elderly victims then mailed checks to mailboxes controlled by individuals involved in the scheme or they deposited money into the bank accounts of these individuals. The victims never received any prize money. In addition to these means of procuring money from the victims, the coconspirators occasionally demanded that victims wire money directly to nominee accounts controlled by the coconspirators; transfer money to foreign exchange trading accounts set up by the coconspirators in the names of the victims; and mail checks to yet other victims, under the pretense that such checks were from "investors" who were offering to help these secondary victims pay their own prepayments and fees. Victim statements, bank records, coconspirator statements, and contemporaneous recordings of calls would establish these facts at trial.

While engaged in this scheme, GUTIERREZ resided in Toronto, Canada and Medellin, Colombia.

In furtherance of the conspiracy, GUTIERREZ obtained the telephone numbers and addresses of mostly elderly individuals who resided in the Eastern District of California and elsewhere in the United States from COCONSPIRATOR A. COCONSPIRATOR A sold GUTIERREZ and his coconspirators

---

[1] Evidence in this case shows that GUTIERREZ and his partners have been perpetrating lottery schemes since approximately 1999. However, due to Statute of Limitations issues and difficulty in obtaining records from that time period, the focus of this investigation did not cover the activities between approximately 1999-2012.

lists of sweepstakes participants and their contact information, screened by location and age.
Conspirators GUTIERREZ, Adedayo Agbayewa (charged in a related case), and COCONSPIRATOR B
made false statements to elderly victims over the phone to induce these victims to send GUTIERREZ,
AGBAYEWA, and COCONSPIRATOR B money.  Among other false statements, GUTIERREZ,
AGBAYEWA, and COCONSPIRATOR B told elderly victims that they had won a cash prize from a
lottery or sweepstakes; that the elderly victims needed to pay "tax" and/or or "insurance" fees on the
prize money prior to receiving their winnings; and that they (the callers, GUTIERREZ, AGBAYEWA,
and COCONSPIRATOR B) were named "Stan Peterson," "David Walsh," "Bill Nichols," and "Richard
Walton," among dozens of aliases used by the callers.  In fact, GUTIERREZ, AGBAYEWA, and
COCONSPIRATOR B knew at the time that none of these statements to the elderly victims were true:
the victims had not won any lottery or sweepstakes prize, did not have to pay a tax or insurance fee in
order to collect any winnings, and GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B were not
named "Stan Peterson," "David Walsh," "Bill Nichols," or "Richard Walton" or any of the dozens of
other aliases they used.

It was another object of the conspiracy to then launder the money obtained by way of this lottery
fraud scheme.  GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B directed the elderly victims to
mail checks to commercial mailboxes located in such places including Washington State, Virginia, and
Pennsylvania, which in turn were controlled by "money mules" working with GUTIERREZ,
AGBAYEWA, and COCONSPIRATOR B, and other members of the conspiracy, such as Eduardo
Cartagena and Oldaim Lopes.  The victims' checks were then deposited into bank accounts that the
"money mules" had opened using fraudulent identities and other fraudulent information.  These "money
mules" and others in the conspiracy responsible for the "banking" related to the scheme then wired these
victim proceeds to accounts controlled by COCONSPIRATOR C and other conspirators in the United
Kingdom, Canada, Cyprus, Singapore, Nigeria, and elsewhere throughout the world.  The conspirators
arranged for such international money transfers before monetizing the scheme proceeds so that they
could evade detection and conceal the true nature of the eventual transfers into their own accounts.

Sometimes, GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B, and their coconspirators
would instead have victims mail their checks to yet other victims.  This was done to persuade these

1  secondary, recipient victims that the lottery or sweepstakes was in fact legitimate, and to conceal the

2  nature of these proceeds before they actually arrived at mailboxes controlled by the conspirators. The

3  secondary victims were told that these checks were from "investors" trying to help the secondary

4  victims make their pre-payments, but in fact the checks were from other victims. The secondary victims

5  were then instructed to send this money along with other payment amounts to mailboxes controlled by

6  the conspirators. For example, on or about August 30, 2013, GUTIERREZ called Victim 1 and

7  informed her that she would be receiving checks from "investors" who were advancing her money to

8  help her meet prepayment obligations on her lottery winnings. Victim 1 was subsequently instructed to

9  use these amounts to mail her supposed prepayment to a U.P.S. mailbox in Winchester, Virginia,

10  controlled by the conspirators.

11  In furtherance of the conspiracy, GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B, and

12  other coconspirators specifically targeted individuals above age 55 because of their increased

13  susceptibility to this type of telemarketing scheme. There were in excess of 30 victims of this scheme

14  over the age of 55. Victim interviews, coconspirator statements, DMV records, and bank records

15  establish this victimization. At least five victims suffered substantial financial hardship as a result of the

16  telemarketing scheme.

17  In terms of loss, between in or about August 2012 and February 2017, GUTIERREZ,

18  AGBAYEWA, and COCONSPIRATOR B, and their coconspirators fraudulently obtained at least

19  approximately $8,000,000 of victims' money related to this scheme. Bank statements, documentation

20  found within email accounts, and victim interviews would establish that these actual losses were

21  deposited into bank accounts associated with the scheme.

22  In addition to this actual loss, GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B, and

23  their coconspirators also attempted to cause significantly greater losses among the victims that, but-for

24  the intervention of law enforcement, would have been realized. GUTIERREZ, AGBAYEWA, and

25  COCONSPIRATOR B, and their coconspirators requested that known victims of the fraud mail

26  additional checks or send additional wires to mailboxes or accounts controlled by the conspirators, or to

27  fellow victims as a way to lull these second victims into believing the sweepstakes or lottery was

28

1 | legitimate, totaling approximately $1.3 million.  These checks and wires were halted only because of
2 | law enforcement detection of the scheme.

3 |       On or about July 9, 2013, for the purpose of executing the scheme, GUTIERREZ,
4 | AGBAYEWA, and COCONSPIRATOR B, and their coconspirators caused Victim 1 to place a check in
5 | the U.S. mail in the amount of $19,250 to be delivered to an address in Washington State that was
6 | controlled by a "money mule."  On or about July 19, 2013, for the purpose of executing the scheme,
7 | GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B, and their coconspirators directed the same
8 | money mule to wire $16,800 of Victim 1's money from the money mule's bank account to an account
9 | controlled by Entity A, located in Canada.  GUTIERREZ's coconspirator subsequently received victims'
10 | money from Entity A, via a third-party, as well as receiving victims' money from other known nominee
11 | accounts and individuals associated with this scheme.

12 |       On or about September 11, 2013, as part of the fraud scheme, GUTIERREZ, AGBAYEWA, and
13 | COCONSPIRATOR B caused Victim 1 to place in the U.S. mail two items:  (1) two checks, each for
14 | $34,000, from Vallejo to Winchester, Virginia, and (2) a check for $86,000 from Vallejo to Santa Rosa.
15 | These mailings were observed by federal law enforcement agents, and the calls related to their
16 | solicitation were recorded.

17 |       In addition, GUTIERREZ, AGBAYEWA, and COCONSPIRATOR B and their coconspirators
18 | arranged for COCONSPIRATOR C to launder some of the proceeds of the sweepstakes fraud scheme
19 | through international accounts, to conceal and disguise the nature, source, ownership and control of the
20 | proceeds.  COCONSPIRATOR C charged a fee as high as 40 percent to launder the proceeds of the
21 | sweepstakes fraud.

22 |       I, ALEXANDER FRANCO GUTIERREZ, have carefully reviewed the above Exhibit A:
23 | Factual Basis for Plea with my attorney.  As far as my own conduct and the conduct of which I am
24 | aware is concerned, the facts described above are true and I adopt this Factual Basis for Plea as my own
25 | true statement.

26 |       Dated:                           _____
                                          ALEXANDER FRANCO GUTIERREZ
27 |                                        Defendant

28 |

PLEA AGREEMENT                                    A-4